## KMG KANAL–MULLER–GRUPPE DEUTSCHLAND GMBH & CO. KG and KMG International GmbH & Co. KG, Appellants,

v.

### Robert C. DAVIS, Appellee.

No. 01–02–00344–CV.

Court of Appeals of Texas, Houston (1st Dist.).

March 10, 2005.

---

Brendan D. Cook, Baker & McKenzie, Houston, for Appellants.

Scott Carpenter, Houston, for Appellee.

Panel consists of Chief Justice RADACK and Justices KEYES and ALCALA.

## OPINION

EVELYN V. KEYES, Justice.

This is an appeal of the trial court's award of $1,000,000 to plaintiff/appellee, Robert C. Davis, after the jury determined that defendants/appellants, KMG Kanal–Muller–Gruppe Deutschland GmbH & Co. KG (KMGD) and KMG International GmbH & Co. KG (KMGI) made a negligent misrepresentation to Davis in regard to his employment, a misrepresentation on which Davis relied and from which he sustained damages.

In eight issues, appellants contend (1) the trial court erred in denying KMGD's special appearance; (2) the trial court erred in overruling appellants' motion to exclude the expert testimony of Keith Fairchild; (3) whether Davis was a member of the company Inliner Advantage was a question of law, not fact, which was previously answered in the negative by the trial court in summary judgment and should not have been submitted to the jury; (4) there was no evidence to support the jury's answer that Davis was a member of Inliner Advantage or that appellants made any negligent representation to Davis; (5) the damages question should not have been submitted to the jury because there was no evidence to support it, the measure of damages used was improper, and the damages question impermissibly commingled past and future damages; (6) the jury provided irreconcilable answers to questions six and seven; (7) the trial court erred in denying appellants' motion for directed verdict; and (8) prejudgment interest was improperly awarded. We modify the judgment and, as modified, affirm.

## Factual Background

KMGD, a German company, manufactures and licenses a technology to repair broken sewer and drainage pipes extending from residences to sewage treatment plants without having to remove the pipes—a technology known as the Inliner Cured–In–Place Pipe System. KMGI, a subsidiary of KMGD created to market the technology internationally, granted an exclusive license to a Houston-based company, Inliner U.S.A., to repair pipes in the United States using Inliner technology and to sublicense others to perform such repairs. Inliner U.S.A. hired Davis in 1991.

Six years later, after problems developed between KMGI and Inliner U.S.A., KMGI terminated the licensing agreement with Inliner U.S.A. and filed suit against the company. In the meantime, Davis had left his job at Inliner U.S.A.

KMGI created a new company—Inliner Advantage—to replace Inliner U.S.A. as the exclusive license-holder for the United States and hired Davis to serve as the new company's general manager. The parties signed an employment agreement that set out Davis's base salary, granted him a membership interest in Inliner Advantage equal to five percent of the company's outstanding capital interest at the time of issuance, and guaranteed him incentive compensation for the execution of each sublicense—ten percent of the license fee or $10,000, whichever was greater, payable after the sublicensee had generated over $100,000 from installations.

After Inliner Advantage lost money during its first year of operations, KMGI sought to merge the company with another that was more financially secure. KMGI originally entered into contract negotiations with Reynolds, Inc., which was already sub-licensed by KMGI, and attempted to amend Davis's employment contract specifically to exclude any incentive compensation to Davis based on the negotiations with Reynolds, Inc. Davis refused to sign, and KMGI ultimately contracted with Johnson Suisse PTE, Ltd. and Johnson Pacific PTE, Ltd. to create a third business—Inliner Technologies, Inc.—to replace Inliner Advantage and to take over the tasks of marketing and licensing Inliner technology in the United States and, in addition, Canada. Johnson Suisse hired Davis to run this new company, but Davis left the company in 2001.

Davis received neither the five-percent membership interest in Inliner Advantage nor any of the promised incentive compensation for the execution of sublicenses. He sued KMGI and KMGD for breach of contract and negligent misrepresentation. A jury found in his favor, and this appeal ensued.

## Special Appearance

In its first issue, KMGD contends that the trial court erred in denying its special appearance because KMGD did not have sufficient minimum contacts with this forum for a Texas court to exercise personal jurisdiction over it.

### *Personal Jurisdiction*

■ Two conditions must be met for a Texas court to exercise personal jurisdiction over a non-resident defendant: the Texas long-arm statute must authorize the exercise of jurisdiction, and the exercise of jurisdiction must be consistent with the guarantees of due process. *BMC Software Belgium, N.V. v. Marchand,* 83 S.W.3d 789, 795 (Tex.2002); *Schlobohm v. Schapiro,* 784 S.W.2d 355, 356 (Tex.1990).

The Texas long-arm statute allows a Texas court to exercise personal jurisdiction over a non-resident defendant that does business in Texas. TEX. CIV. PRAC. & REM.CODE ANN. § 17.042 (Vernon 1997). A non-resident does business in Texas if it (1) contracts by mail or otherwise with a Texas resident and either party is to perform the contract in whole or in part in this state; (2) commits a tort in whole or in part in this state; or (3) recruits Texas residents, directly or through an intermediary located in this state, for employment inside or outside this state. *Id.* In addition, the statute provides that "other acts" by the non-resident can satisfy the requirement of "doing business" in Texas. *Id.; see also Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.,* 815 S.W.2d 223, 227 (Tex.1991).

Because the language of the long-arm statute is broad, its requirements are considered satisfied if the exercise of personal jurisdiction comports with federal due process limitations. *CSR Ltd. v. Link*, 925 S.W.2d 591, 594 (Tex.1996). Due process considerations are satisfied if a defendant directs his tortious conduct toward the forum state with the foreseeable knowledge that his actions will cause harm to a resident of the forum and the defendant purposefully avails himself of the privilege of conducting activities within the forum state. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474–76, 105 S.Ct. 2174, 2182–84, 85 L.Ed.2d 528 (1985).[1]

The cornerstone of due process in the context of personal jurisdiction is the minimum-contacts analysis. *Schlobohm*, 784 S.W.2d at 357. The goal of this analysis is to protect a defendant from being unjustifiably called before the courts of a foreign state. *Id.* To establish minimum-contacts with a state, the defendant "must do something purposeful to avail himself of the privilege of conducting activities in the forum, thus invoking the benefit and protection of its laws." *Id.; see also Burger King*, 471 U.S. at 474–76, 105 S.Ct. at 2183–84. A defendant should not be subject to the jurisdiction of a Texas court based upon random, fortuitous, or attenuated contacts. *CSR Ltd.*, 925 S.W.2d at 595. The purposeful availment requirement ensures that the non-resident defendant's contact must result from its purposeful contact, not the unilateral activity of the plaintiff or a third party. *See Guardian Royal*, 815 S.W.2d at 227. It is the quality and nature of the contacts, rather than their number, that is important. *Id.* at 230 n. 11. The exercise of

personal jurisdiction is proper when the contacts proximately result from actions of the non-resident defendant that create a substantial connection with the forum state. *Id.* at 226.

Although it is not determinative, foreseeability is an important consideration in deciding whether the non-resident defendant has purposefully established minimum contacts with the forum state. *Id.* at 227. Foreseeability is not an independent component of the minimum-contacts analysis but is implicit in the requirement that there be a "substantial connection" between the non-resident defendant and Texas arising from the action or conduct of the non-resident defendant purposefully directed toward Texas. *Id.* Individuals must have fair warning that a particular activity may subject them to the jurisdiction of a foreign sovereign. *Burger King*, 471 U.S. at 472, 105 S.Ct. at 2182; *Guardian Royal*, 815 S.W.2d at 226. In other words, an important inquiry in the jurisdictional analysis is whether "the defendant's conduct and connection with the forum State [is] such that he should reasonably anticipate being haled into court there." *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980).

Personal jurisdiction exists if the non-resident defendant's minimum-contacts give rise to either specific jurisdiction or general jurisdiction. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 413–14 & nn. 8–9, 104 S.Ct. 1868, 1872 & nn. 8–9, 80 L.Ed.2d 404 (1984). General jurisdiction is present when a defendant's contacts are continuous and systematic, allowing the forum to

---

1. Although not the norm, a single telephone call has been held to constitute sufficient contact with Texas for our courts to exercise long-arm jurisdiction, when the tortfeasor knew the brunt of the injury would be felt by a Texas resident. *See Mem'l Hosp. Sys. v. Fisher Ins. Agency*, 835 S.W.2d 645, 651 (Tex. App.-Houston [14th Dist.] 1992, no writ).

exercise personal jurisdiction over the defendant even if the cause of action did not arise from or relate to activities conducted within the forum state. *Guardian Royal,* 815 S.W.2d at 228. General jurisdiction requires a showing that the defendant conducted substantial activities within the forum, a more demanding minimum-contacts analysis than for specific jurisdiction. *Id.*

Specific jurisdiction is established if the non-resident defendant's alleged liability arises from or is related to the defendant's purposeful contact with the forum. *Helicopteros,* 466 U.S. at 414 & n. 8, 104 S.Ct. at 1872 & n. 8. When specific jurisdiction is asserted, the minimum-contacts analysis focuses on the relationship among the defendant, the forum, and the litigation. *Guardian Royal,* 815 S.W.2d at 227–28. It is not necessary that a non-resident defendant's conduct actually occur in Texas, as long as the defendant's acts were purposefully directed toward the state. *CSR Ltd.,* 925 S.W.2d at 595. A defendant should reasonably anticipate being haled into court when the effects of its conduct have been intentionally caused through the purposeful direction of activity toward the forum state, even if the defendant never physically enters the state. *Wright v. Sage Eng'g, Inc.,* 137 S.W.3d 238, 248 (Tex.App.-Houston [1st Dist.] 2004, pet. denied). When, as here, the foreign defendant has had a single or few contacts with the forum by virtue of a contract, prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing, must be evaluated to determine whether the defendant purposefully established minimum-contacts within the forum. *Burger King,* 471 U.S. at 479, 105 S.Ct. at 2186.

### Standard of Review

Whether a court has personal jurisdiction over a defendant is a question of law, which we review de novo. *Marchand,* 83 S.W.3d at 794. However, the trial court frequently must resolve questions of fact before deciding the jurisdictional question. *Id.* When, as here, the trial court does not issue findings of fact and conclusions of law with its special-appearance ruling, all facts necessary to support the judgment and supported by the evidence are implied. *Id.* at 795. However, in cases in which the appellate record includes both the reporter's and clerk's records, as it does here, these implied findings are not conclusive and may be challenged for legal and factual sufficiency. *Id.*

### KMGD's Purposeful Contacts with Texas

We begin our review of the trial court's denial of KMGD's special appearance by determining whether specific jurisdiction exists over it. As plaintiff, Davis bore the initial burden to make sufficient allegations to bring KMGD within the personal jurisdiction of the trial court. *See Marchand,* 83 S.W.3d at 793; *Wright,* 137 S.W.3d at 249. Once Davis met this burden, KMGD was required to negate all possible grounds for personal jurisdiction. *See Marchand,* 83 S.W.3d at 793.

In his live pleadings on file when the trial court decided the special appearance, Davis, a Texas resident, relied on the employment contract he had entered into with KMGD's managing partner, Hans Muller, and alleged that every KMG entity, including KMGD, had committed tortious acts in Texas. Our long-arm statute allows personal jurisdiction over a non-resident defendant (1) that contracts by mail or otherwise with a Texas resident if either party is to perform the contract in whole or in part in this state, (2) that commits a tort in whole or in part in this

state, or (3) that recruits a Texas resident for employment. TEX. CIV. PRAC. & REM. CODE ANN. § 17.042(2).

The record shows that, although much of the business activity regarding Inliner Technologies took place in Germany, KMGD did conduct business in Texas. In 1998, unbeknownst to Davis, Muller transferred the United States licensing rights to Inliner technology from KMGI to KMGD, giving KMGD a "slice of the pie." KMGD, in turn, granted the exclusive right to license and market the technology to Johnson Suisse. The contract between KMGD and Johnson Suisse transferred the rights to a Texas company, Inliner Technologies. In 1999, KMGD entered into a contract with Inliner Technologies that called for performance in Texas. Inliner Technologies had its headquarters in Houston, and Davis managed Inliner Technologies, as he had its predecessor, Inliner Advantage. Muller and Davis negotiated Davis's employment contract in Germany while Muller was the managing director of both KMGI and KMGD.

After examining the prior negotiations, contemplated future consequences, the terms of the contract, and the parties' actual course of dealing, we conclude that KMGD should have reasonably anticipated being haled into court in Texas, where the effects of its conduct were intentionally caused through the purposeful business activity it directed toward this state. *See Burger King*, 471 U.S. at 480, 105 S.Ct. at 2186. Accordingly, Davis met his burden of pleading sufficient jurisdictional allegations to bring KMGD within the specific personal jurisdiction of the trial court. The trial court did not err in denying KMGD's special appearance.

We overrule the first issue.

### Expert Economic Testimony

In their second issue, appellants contend the trial court erred by not granting their motion to exclude the expert testimony of Dr. Keith Fairchild, an economist who testified at trial as to the "present and future value" of Davis's employment contract and who presented a damages model to the jury.

■ Before addressing appellants' challenge to Fairchild's testimony, we first consider Davis's contention that appellants waived their objection to Fairchild's testimony because they did not re-urge their objection to his testimony during the trial. Davis relies solely on *Piro v. Sarofim*, 80 S.W.3d 717, 720 (Tex.App.-Houston [1st Dist.] 2002, no pet), to argue that appellants were obligated to object a second time to Fairchild's testimony when he was offered as an expert during trial, even though there was a pre-trial *Robinson–Daubert* hearing.[2] We reject this contention. Even if we agreed that *Piro* expressly stands for this proposition of law, which we do not, the circumstances before us are distinguishable. In *Piro*, the trial court based its ruling solely on a pre-trial review of the expert's affidavit and deposition, not on his live testimony. *Id.* Here, the trial court was able to evaluate Fairchild's testimony at a pre-trial *Robinson–Daubert* hearing; the court was not limited to written documents, as was the court in *Piro*. In addition, despite appearing to require repeated objections, as Davis argues, this Court actually observed in *Piro* that a party must object to expert evidence before trial **or** when it is offered, not before trial **and** when it is offered. *Id.* at 720–21 (citing *Maritime Overseas Corp. v.*

**2.** *See E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 556 (Tex.1995) (adopting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591–92, 113 S.Ct. 2786, 2795–96, 125 L.Ed.2d 469 (1993)).

*Ellis,* 971 S.W.2d 402, 409 (Tex.1998) ("[T]o preserve a complaint that scientific evidence is unreliable and thus, no evidence, a party must object to the evidence before trial or when the evidence is offered.")). Appellants made a proper and timely objection before trial to Fairchild's testimony; thus, they are not precluded from alleging error on appeal. Accordingly, we turn to the issue of whether Fairchild's expert testimony was properly admitted.

### Standard of Review

The trial court acts as an evidentiary gatekeeper to screen out irrelevant and unreliable expert evidence. *Exxon Pipeline Co. v. Zwahr,* 88 S.W.3d 623, 629 (Tex.2002). A trial court has broad discretion to determine the admissibility of evidence, and we will reverse only if that discretion has been abused, *i.e.,* if the trial court acted without reference to any guiding principles. *Keo v. Vu,* 76 S.W.3d 725, 730 (Tex.App.-Houston [1st Dist.] 2002, pet. denied). Non-scientific testimony is admissible if it is offered by a qualified expert and the testimony is relevant and based on a reliable foundation. *See Gammill v. Jack Williams Chevrolet, Inc.,* 972 S.W.2d 713, 723 (Tex.1998). Appellants challenged Fairchild's qualifications to testify as to the present and future value of Davis's employment contract and contended that Fairchild's testimony was neither relevant nor based on a reliable foundation.

### Qualifications

The record reflects that Fairchild has a doctorate in economics, teaches a university course in corporate valuation, and often acts a consultant preparing valuations for various corporations. That he has a PhD, instead of a master's degree in business administration, and is not a Certi-fied Public Accountant does not mean he was unqualified. The trial court did not abuse its discretion by implicitly finding that Fairchild was qualified to offer expert testimony by virtue of his education, his teaching experience, and his practical experience in corporate valuation.

### Relevance

Expert testimony is relevant if it will aid the jury in resolving a factual dispute. *E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d 549, 556 (Tex. 1995). Part of the jury's task in this case was to determine whether and to what extent Davis was economically damaged when appellants breached the terms of his employment contract. The trial court did not abuse its discretion by implicitly finding that Fairchild's testimony regarding the economic losses Davis sustained was clearly relevant to the jury's task.

### Foundation

Scientific evidence must have a reliable foundation. *Gammill,* 972 S.W.2d at 723. To that end, the trial court is charged with ensuring that the expert opinion comports with applicable professional standards. *Id.* at 725. Fairchild testified that his top-down approach to corporate valuation is considered the only valid approach to valuation in academia, and is also generally accepted in the financial community as a valid method. KMG did not rebut this method of valuation at trial; nor did it offer an alternate method of valuation. The record reflects that Fairchild admitted that corporate valuation necessarily entails a fundamental degree of speculation; but that does not mean that the underlying foundation of the methodology is unreliable, nor was any authority offered that rejected the top-down approach to corporate valuation as unreliable. In addition, although Fairchild had to

make a number of assumptions about the future business of Inliner Advantage, he also was able to review the actual business history of Inliner Advantage's predecessor company, Inliner U.S.A., and its successor company, Inliner Technologies. Davis was associated with all three companies. Opinions or estimates of lost profits are competent evidence of lost profits if they are based on objective facts, figures, or data from which the amount of lost profits can be ascertained. *Texaco, Inc. v. Phan,* 137 S.W.3d 763, 771 (Tex.App.-Houston [1st Dist.] 2004, no pet.). Recovery of lost profits must be predicated on one complete calculation, but there is more than one correct method to calculate lost profits. *Id.* In the absence of contrary evidence, we are persuaded that the trial court did not abuse its discretion by implicitly finding that Fairchild's approach to valuing the corporation comported with applicable professional standards.

In sum, the record reflects that Fairchild was qualified, his testimony was relevant, and his methodology was reliable. Therefore, the trial court did not err in admitting his testimony.

We overrule appellants' second issue.

### Jury Charge Error

Appellants allege jury charge error in three of their issues.

### *Membership in Inliner Advantage*

In their third issue, appellants contend the trial court erred in submitting question one to the jury—"Was Davis a member of Inliner Advantage?" [3] Appellants contend that this question had already been answered as a matter of law.

Appellants filed a motion for partial summary judgment and dismissal of Davis's derivative shareholder claims, which the trial court granted. Because they argued in their motion that Davis was not a member of Inliner Advantage and that he did not have standing or capacity to bring a derivative action, appellants contend that by granting their motion for partial summary judgment the trial court had already found as a matter of law that Davis was not a member of Inliner Advantage; thus, the jury should not have been permitted to answer this question.

The record supports Davis's contention that appellants characterized the question of whether Davis was a member of Inliner Advantage as an issue of fact. Moreover, appellants did not object to submission of question one to the jury. Accordingly, they have not preserved error. *See* Tex.R. Civ. P. 274 (providing that party objecting to charge must point out distinctly the objectionable matter and grounds of objection); Tex.R.App. P. 33.1 (providing that party must make timely objection to preserve error for appellate review).

We overrule the third issue.

### *Intentional Interference with Contract*

In their sixth issue, appellants contend that the jury's answer of "Yes" to question six, "Did KMGI intentionally interfere with Robert Davis's employment contract with Inliner Advantage?," was irreconcilable with its answer of "Yes" to question seven, "Did KMGI interfere because it had a good faith belief that it had a right to do so?"

We do not consider these answers irreconcilable. Justification is an affirmative defense to tortious interference with contract based on either the exercise of (1) one's own legal rights, or (2) a good

---

3. The jury question included definitions of who was a "member" of a limited liability partnership and when such a membership could begin. The jury answered "No" to question one.

faith claim to a colorable legal right, even though that claim ultimately proves to be mistaken. *Tex. Beef Cattle Co. v. Green,* 921 S.W.2d 203, 211 (Tex.1996). If a defendant cannot establish a legal right as a matter of law, it may prevail on its justification defense if (1) the trial court determines that the defendant interfered while exercising a colorable legal right and (2) the jury finds that the defendant exercised the colorable legal right in good faith. *Id.* Here, the jury was instructed to answer additional questions about whether KMGI acted with malice and what actual or exemplary damages resulted from the interference only if it answered "No" to question seven; in other words, only if the jury found that the interference was *not* justified would it have considered the issues of malice and damages. The jury's award of damages was based on its answers to questions other than six and seven.

■■■ Even if the answers had been irreconcilable, appellants were required to make a timely objection to the trial court. The Rules of Civil Procedure permit the trial court to direct the jury to correct its verdict when its answers are in conflict. TEX.R. CIV. P. 295. Thus, to preserve error, an appellant must object to the conflict or inconsistency before the jury is discharged. *Greater Houston Transp. Co. v. Zrubeck,* 850 S.W.2d 579, 586 (Tex.App.-Corpus Christi 1993, writ denied); *Roling v. Alamo Group (USA), Inc.,* 840 S.W.2d 107, 109 (Tex.App.-Eastland 1992, writ denied). Appellants did not preserve error for our review.

We overrule the sixth issue.

### *Measure of Damages*

■■■ In their fifth issue, appellants contend the trial court erred in submitting question 17—"What sum of money, if any, paid now in cash, would fairly and reasonably compensate Robert Davis for his damages, if any, that were proximately caused by such negligent misrepresentation?"—because the question improperly commingled past and future damages. The record shows that the objection to this question at trial was based on insufficient evidence, not on commingling of damages: "Question No. 17, I also [sic] object on the basis there's no evidence or insufficient evidence to justify a submission of those [sic] questions to the jury." No other objection to question 17 was lodged. This trial objection does not comport with the challenge made on appeal. Accordingly, any error is waived. *See Bracewell v. Bracewell,* 31 S.W.3d 610, 616 (Tex.App.-Houston [1st Dist.] 1999, pet. denied) (holding that error waived when objection to jury charge at trial differed from objection on appeal); *see also Haskett v. Butts,* 83 S.W.3d 213, 220 (Tex.App.-Waco 2002, pet. denied) (holding that defendant waived complaint that evidence was legally and factually insufficient to show which of plaintiff's medical expenses may have been associated only with claims in lawsuit because defendant did not object or request instruction requiring jury to segregate damages).

Appellants further contend in their fifth issue that the measure of damages was improper because the proper remedy for a claim of negligent misrepresentation is "out-of-pocket expenses," not the "benefit-of-the-bargain" damages typically awarded for breach-of-contract claims. Appellants did not make a timely, specific objection to question 17 on this basis. The failure to object that the damages issue was based on the wrong measure of damages waived any error as to the form or substance of the damages issue. *See C.M. Asfahl Agency v. Tensor, Inc.,* 135 S.W.3d 768, 786 (Tex.App.-Houston [1st Dist.] 2004, no pet.); *see also Tom Benson Chevrolet, Inc. v. Alvarado,* 636 S.W.2d 815, 822–23 (Tex. App.-San Antonio 1982, writ ref'd n.r.e.);

*Traylor v. Gray*, 547 S.W.2d 644, 658 (Tex. Civ.App.-Corpus Christi 1977, writ ref'd n.r.e.). Appellants made only one "over-arching" objection at trial to all "tort claims" on the ground that the evidence of damages could be characterized only as "economic loss to the subject matter of the contract itself." Only in post-trial motions did appellants specifically challenge the measure of damages used in question 17.

Because appellants failed to make a timely objection to the jury instructions concerning the type and measure of damages, we conclude that they waived their complaint that the trial court awarded negligent misrepresentation damages based on a legally incorrect measure of damages. *See Columbia/HCA Healthcare Corp. v. Cottey*, 72 S.W.3d 735, 747 (Tex.App.-Waco 2002, no pet.) (determining that, because there was no objection to charge as submitted, defendants could not complain on appeal that jury awarded damages which would not otherwise be recoverable for fraudulent inducement); *Tribble & Stephens Co. v. Consol. Servs., Inc.*, 744 S.W.2d 945, 949 (Tex.App.-San Antonio 1987, writ denied) (holding that defendant had waived right to complain on appeal that plaintiff had offered insufficient evidence of proper measure of damages because defendant failed to point out to trial court that improper measure of damages was submitted to jury); *Vaughn Bldg. Corp. v. Austin Co.*, 620 S.W.2d 678, 683 (Tex.Civ.App.-Dallas 1981), *aff'd*, 643 S.W.2d 113 (Tex.1982) (concluding that sufficiency-of-evidence challenge based on contention that erroneous measure of damages was submitted to jury was waived by defendant's failure to object on that basis in trial court).

We overrule the fifth issue.

We hold that appellants have not preserved error in the jury charge itself. To the extent that appellants challenge the sufficiency of the evidence to support the submission of questions one and 17 to the jury in their fifth issue, we address this challenge in the next section of this opinion.

## Legal Sufficiency of the Evidence

In their fourth issue, appellants contend the evidence is legally insufficient to support the jury's finding that appellants' made a negligent misrepresentation to Davis on which he relied to his detriment. In their seventh issue, appellants contend the trial court erred in denying its motion for a directed verdict.

### Standard of Review

When a party attacks the legal sufficiency of an adverse finding on an issue on which it did not have the burden of proof at trial, it must show on appeal that there is no evidence to support the adverse finding. *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex.1983). We consider only the evidence and inferences that tend to support the finding and disregard all evidence and inferences to the contrary. *Southwest Key Program, Inc. v. Gil–Perez*, 81 S.W.3d 269, 274 (Tex.2002). If more than a scintilla of evidence exists to support the finding, the no-evidence challenge fails. *Formosa Plastics Corp., U.S.A. v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex.1998). More than a scintilla of evidence exists if the evidence furnishes some reasonable basis for differing conclusions by reasonable minds about a vital fact's existence. *Lee Lewis Const., Inc. v. Harrison*, 70 S.W.3d 778, 782–83 (Tex.2001).

The standard for review of the denial of a motion for directed verdict is the same as that for legal sufficiency. Such a motion is properly granted only when there is no evidence to support an affirmative jury award. *Capital Title Co.*

*v. Donaldson,* 739 S.W.2d 384, 392 (Tex. App.-Houston [1st Dist.] 1987, no writ). If there is any evidence of probative value raising an issue of fact on material questions presented, a directed verdict is improper. *Qantel Bus. Sys., Inc. v. Custom Controls,* 761 S.W.2d 302, 304 (Tex.1988). Because the standard of review is the same for both issues and because the same evidence adduced at trial pertains to both issues, we analyze these issues together.

### Evidence of Negligent Misrepresentation

■ The elements of a cause of action for negligent misrepresentation are as follows: (1) a representation was made by the defendant in the course of his business or in a transaction in which the defendant had a pecuniary interest; (2) the defendant supplied "false information" for the guidance of others in their business; (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information; and (4) the plaintiff suffered pecuniary loss by justifiably relying on the defendant's misrepresentation. *Fed. Land Bank Ass'n of Tyler v. Sloane,* 825 S.W.2d 439, 442 (Tex.1991).

■ At trial, Davis identified three representations KMGI made to him that he contended were negligent misrepresentations: (1) that he would be granted a five-percent membership in Inliner Advantage; (2) that Inliner Advantage would hold the exclusive right to license persons in the United States to use the Inliner technology; and (3) that he would receive a percentage of the fee for each license sold in the United States. Jury question sixteen asked, "Did KMGI or KMGD make a negligent misrepresentation on which Robert C. Davis justifiably relied?"; the jury answered "Yes" as to both KMGI and

KMGD. When asked to determine Davis's damages based on negligent misrepresentation, the jury was offered the five-percent membership interest in the company that Davis was promised and the incentive fee he was to receive for each license sold. The jury answered with no damages for loss of incentive fees, but awarded $1,000,000 in damages to Davis for the negligent misrepresentation made to him regarding his five-percent membership interest. Based on the jury's answers, we restrict our inquiry to whether the evidence was legally sufficient to support the jury's finding that KMGI and KMGD made a negligent misrepresentation to Davis in regard to his membership interest in Inliner Advantage.

Davis's employment contract with KMGI included the following provision:

> **6.3 Membership Interest Grant.** Company agrees to grant membership interest to Davis in the Company equal to five percent of the outstanding capital interest at the time of issuance, which grant shall be structured so as to be tax free to Davis.

Davis's employment contract thus evidenced Inliner Advantage's promise to grant a five-percent membership interest to him.[4] Appellants contend, however, that none of the conditions precedent to granting a membership interest to Davis were met, including a $5,000 capital contribution they contend Davis was required to make to obtain membership; therefore, they contend, there is no evidence to support the jury's finding that the appellants made a negligent misrepresentation to Davis.

The issue here is not whether Davis actually became a member of Inliner Advantage; rather, it is whether there was

---

4. To "grant" means to give something, with

or without compensation. BLACK'S LAW DICTIO-

more than a scintilla of evidence to support the finding that appellants negligently misrepresented to Davis that he would become a member of Inliner Advantage and would be entitled to a five-percent interest in Inliner Advantage without the payment of $5,000 as a condition precedent to membership. Although a KMGI representative testified that a $5,000 contribution from Davis was required before Davis could become a member of Inliner Advantage, there is no mention of an initial $5,000 contribution in this or any other provision of Davis's employment contract. Moreover, the regulations proposed to govern Inliner Advantage, although never executed, anticipated that Davis would be an initial member of Inliner Advantage as of the date of execution of the regulations. While the regulations also provided that initial members were to make the "Capital Contribution" set forth by their names, no amount was set out by Davis's name in the column labeled "Initial Contribution"; rather, the regulations provided that Davis's *"total commitment"* to Inliner Advantage, *i.e.*, the total amount Davis would be required to contribute to Inliner Advantage over an unspecified period of time, was to be $5,000.[5]

NARY 720 (8th ed.2004).

5. In pertinent part, the regulations provided:

Article 3.
MEMBERSHIP; DISPOSITION OF INTERESTS

Section 3.1 *Initial Members.* The initial Members of the Company are the Persons executing these Regulations as Members as of the date of these Regulations, each of which is hereby admitted to the Company as a Class A Member effective contemporaneously with the execution by such Person of these Regulations.

Article 4.
CAPITAL CONTRIBUTIONS

Section 4.1 *Initial Contributions.* Contemporaneously with this execution of these Regulations, each initial Member shall make the Capital Contribution set forth by such Member's name on *Exhibit "A."*

Section 4.2 *Subsequent Contributions.....* [E]ach Member shall from time to time contribute to the Company, in cash, on or before the date hereinafter described, that Member's Sharing Ratio of all monies that in the judgment of the Managers are necessary to enable the Company to cause the assets of the Company to be properly operated and maintained and to discharge its costs, expenses, obligations, and liabilities; provided, however, that a Member shall not be obligated to contribute any amount that, when added to all Capital Contributions previously made by that Member, exceeds that Member's Commitment. The Managers shall notify each Member of any need for Capital Contributions pursuant to this Section 4.2 when appropriate, and the notice shall include a statement in reasonable detail of the proposed uses of the Capital Contributions and a date (which date may be no earlier than the fifth Business Day following each Member's receipt of its notice) before which the Capital Contributions must be made....

. . . .

*EXHIBIT "A"*

| Name and Address of Class A Member | Initial Contribution | Total Commitment | Sharing Ratio |
|---|---|---|---|
| Fred Huepers Echienkampstrasse 5 32760 Detmolel | | $95,000 | 95% |

The employment contract and the regulations constitute evidence from which the jury could have inferred that appellants made a representation to Davis that he would become a member of Inliner Advantage with a five-percent interest without payment of $5,000 as a condition precedent to membership. Davis testified that he relied on appellants' representations regarding his membership interest and that he never received this interest. Fairchild testified as to the economic loss Davis sustained when he did not receive the membership interest.

Based on the foregoing, we hold that Davis presented more than a scintilla of evidence on each element of negligent misrepresentation. The evidence was thus legally sufficient to sustain the jury's finding on negligent misrepresentation and to justify submission of a damages question pertaining to this misrepresentation. Therefore, the trial court did not err in submitting the damages question or in denying appellants' motion for directed verdict.

### Evidence of Amount of Damages

We have previously held that appellants waived any error in regard to whether the measure of damages was proper. We further hold that the evidence was legally sufficient to sustain the amount of damages awarded. A jury has the discretion to award damages within the range of evidence presented at trial. *Knox v. Taylor*, 992 S.W.2d 40, 62 (Tex.App.-Houston [14th Dist.] 1999, no pet.). Here, Fairchild's damages models showed a range of damages from $1.8 million to $2.9 million, while appellants' expert estimated damages at roughly $82,000. The jury's damages award fell within the range of evidence presented; thus it was supported by legally sufficient evidence. *Id.*

We overrule the fourth and seventh issues. We further overrule those portions of the fifth issue challenging the sufficiency of the evidence supporting submission of questions one and seventeen to the jury.

### Prejudgment Interest

In their eighth issue, appellants contend the trial court improperly calculated prejudgment interest on the jury's damages award because past and future damages were not segregated. The record supports appellants' assertion that the damages were not separated. Question 17 asked the jury to fill in the amount of damages for "[t]he value of Robert Davis' 5% equity interest in Advantage, L.L.C. Robert Davis lost in the past and the value that, in reasonable probability, Robert Davis will lose in the future." The jury wrote in damages of $1,000,000.

In arguing that prejudgment interest should not have been awarded because past and future damages were not segregated, appellants rely principally on *Cavnar v. Quality Control Parking, Inc.*, 696 S.W.2d 549, 552 (Tex.1985). In *Cavnar*, the court held that, because the Cavnar children were awarded damages for both their past and their future losses in lump sums and did not tender special issues segregating past losses from future losses, the children were not entitled to recover prejudgment interest on those elements of damages. *Id.* at 556.

Germany
Facsimile

Robert C. Davis
4265 San Felipe, Ste. 1100
Houston, Texas 77027
Facsimile: 713-960-6651

$ 5,000     5%

Davis contends that the holding in *Cavnar* has been superseded by statute. *See* TEX. FIN.CODE ANN. § 304.101 (Vernon Supp.2004–2005). This is true, but it is true only when the damages are awarded based on a party's claim for wrongful death, personal injury, or property damage. *See id.; accord C & H Nationwide, Inc. v. Thompson,* 903 S.W.2d 315, 324 (Tex.1994). When, however, as here, the damages are awarded for economic injury, not for personal injury, *Cavnar* still controls. *See Casteel v. Crown Life Ins. Co.,* 3 S.W.3d 582, 596 (Tex.App.-Austin 1997), *rev'd in part on other grounds,* 22 S.W.3d 378, 391 (Tex.2000) (reaffirming viability of *Cavnar*). Thus, because past and future damages were submitted to the jury but were not segregated in the damages question, Davis is not entitled to prejudgment interest. *See Casteel,* 3 S.W.3d at 596.

We sustain appellants' eighth issue.

### Conclusion

We modify the trial court's judgment to vacate the award of prejudgment interest and we affirm the judgment as modified.